2001 UT 81

BEAVER, Box Elder, Cache, Carbon, Davis, Duchesne, Emery, Garfield, Grand, Iron, Juab, Kane, Millard, Morgan, Piute, Rich, Salt Lake, Sanpete, Sevier, Summit, Tooele, Uintah, Utah, Wasatch, Washington, Wayne, and Weber Counties, on behalf of themselves and all other persons or entities similarly situated, Plaintiffs and Appellants,

v.

QWEST, INC., Defendants and Appellees.

Beaver, Box Elder, Cache, Carbon, Davis, Duchesne, Emery, Garfield, Grand, Iron, Juab, Kane, Millard, Morgan, Piute, Rich, Salt Lake, Sanpete, Sevier, Summit, Tooele, Uintah, Utah, Wasatch, Washington, Wayne, and Weber Counties, on behalf of themselves and all other persons or entities similarly situated, Petitioners,

v.

Utah Public Service Commission ex rel. Qwest, Inc., Respondent.

Nos. 990771, 20000140, 990268.

Supreme Court of Utah.

Sept. 7, 2001.

Bill Thomas Peters, David W. Scofield, Salt Lake City, for the Counties.

George M. Haley, Robert L. Stolebarger, Jessica L. Dillon, Christine T. Greenwood, Gregory B. Monson, David L. Mortensen, Salt Lake City, for Qwest Public Service Commission, amicus curiae.

Michael L. Ginsberg, Sandy J. Mooy, Salt Lake City, for the Public Service Commission.

HOWE, Chief Justice:

¶ 1 We have consolidated an appeal by Beaver County and twenty-four other counties of this state (the Counties) from a district court judgment with the Counties' petition for review of a Utah Public Service Commission (PSC) decision. At issue in both cases is the proper disposition of an award of $16.9 million made to U.S. West Communications, Inc. (now Qwest, Inc.), by the Utah State Tax Commission for an overpayment of property taxes made by Qwest to the Counties. The district court held that jurisdiction over the issue lies solely in the PSC and dismissed the complaint. Court costs were also awarded to Qwest and are challenged on appeal. In the review, the Counties assail the refusal of the PSC to issue a declaratory order that Qwest should refund the amount of the award to its ratepayers.

## BACKGROUND

¶ 2 Qwest filed appeals to the Tax Commission from the Counties' assessment of its property for each of the years 1986 through 1998. The Counties either intervened or otherwise maintained that their economic interests would be affected by any resolution of these proceedings. Qwest, the Tax Commission, and the Counties reached a stipulation settling upon an adjusted assessed value for each disputed year. The stipulation required the Counties to refund $16.9 million to Qwest.

¶ 3 The Counties repostured and simultaneously asserted before the district court and the PSC that Qwest had already recouped the amount of taxes it had paid on overvalued property through rates charged to its customers. The Counties contended that allowing Qwest to keep the refund would therefore amount to double recovery. The Counties sought to obtain the refund for themselves and the members of the class of similarly situated ratepayers. The Counties were granted an ex parte order to have the $16.9 million deposited with the district court rather than delivering it to Qwest as ordered by the Tax Commission.

¶ 4 Qwest moved in the district court to dismiss the Counties' complaint for lack of

subject matter jurisdiction, asserting the case should be before the PSC because the decision would require an assessment of rates. Following a hearing on the motion, the district court entered an order dismissing the complaint with prejudice for lack of subject matter jurisdiction pursuant to rule 12(b)(1) of the Utah Rules of Civil Procedure. The district court reasoned that dismissal was appropriate for three reasons: (1) the remedies sought by the Counties required rate making or an adjustment of rates, both of which are within the exclusive jurisdiction of the PSC; (2) rate making and rate adjustments are legislative functions delegated exclusively to the PSC and the court's exercise of the rate making function would violate the constitutional principle of separation of powers; and (3) the Counties have a clear and adequate remedy at law in the form of administrative proceedings before the PSC, which precludes them from invoking the equity jurisdiction of the courts for purposes of imposing a constructive trust. The district court granted Qwest's request for the costs incurred for the preparation of certain exhibits used at the hearing on the motion to dismiss.

¶ 5 The PSC did not respond to the Counties' request for a declaratory ruling, and as a result, it was deemed denied after sixty days of the filing of the request. *See* Utah Code Ann. § 63–46b–21(7) (1997). Rather than petitioning the PSC for a review or rehearing of its request under section 54–7–15, the Counties filed a petition for writ of review in this court.

¶ 6 We granted the Counties' motion to consolidate the appeal of the district court's dismissal with the Counties' petition for writ of review from the PSC's "deemed denial" of the request for a declaratory ruling. We subsequently consolidated the appeal of the district court's award of costs to Qwest with those cases.

¶ 7 The Counties present five issues for review: (1) whether the district court erred in holding that the PSC had exclusive subject matter jurisdiction over this matter; (2) whether the court erred in dismissing the matter with prejudice; (3) whether the court erred in determining the $16.9 million surety bond should be released to Qwest; (4) whether the court erred in granting Qwest's claim

for costs, and (5) whether the Commission erred in not granting the Counties' petition for declaratory action.

## STANDARD OF REVIEW

¶ 8 The determination of whether a court has subject matter jurisdiction is a question of law, which we review for correctness, according no deference to the district court's determination. *Schwenke v. Smith,* 942 P.2d 335, 336 (Utah 1997).

## ANALYSIS

## I. DISTRICT COURT JURISDICTION

 ¶ 9 First, we address whether the district court had subject matter jurisdiction to determine whether the property tax refund to Qwest should be returned to the ratepayers. The Counties contend that since rates set by the PSC are based partially on amounts Qwest incurs for property taxes, any refund should be returned to the ratepayers; otherwise, Qwest receives double recovery. Qwest contends, and the district court agreed, that the PSC is the exclusive forum for resolution of this dispute. The district court reasoned that because Qwest is a public utility subject to comprehensive rate regulation by the PSC, any resolution of the Counties' claim would require inquiry into Qwest's rate structure and other regulatory matters. The district court also reasoned that it was unfit and without jurisdiction and authority to properly adjudicate the issue.

¶ 10 As long ago as 1944, we stated that the PSC's general jurisdiction is "broad and sweeping in scope." *Utah Power & Light Co. v. Pub. Serv. Comm'n,* 107 Utah 155, 183, 152 P.2d 542, 555 (1944) (citing and interpreting precursors to current section 54–4–4 of the Utah Code). We have also held that courts are prohibited from exercising the powers properly belonging to the PSC, which is an arm of the legislative branch of government. *See Mulcahy v. Pub. Serv. Comm'n,* 101 Utah 245, 117 P.2d 298 (1941) (citing art. V, § 1 of the Utah Constitution in relation to limited judicial power to review PSC determination).

¶ 11 The legislative branch possesses the police authority to regulate public utilities and the power to fix public utility rates in order to secure for the public just, uniform, and nondiscriminatory rates. *See Utah Copper Co. v. Pub. Util. Comm'n,* 59 Utah 191, 201, 203 P. 627, 631 (1921). This authority is delegated to the PSC by statute:

> The commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in this state, and to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction....

Utah Code Ann. § 54–4–1 (2000). In addition to the broad powers, the legislature specifically outlined rate making as a delegated function exclusive to the Commission:

> The commission shall have power to investigate a single rate, fare, toll, rental, charge, classification, rule, regulation, contract or practices, or any number thereof, ... of any public utility, and to establish, after hearing, new rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices, or schedule or schedules in lieu thereof.

Utah Code Ann. § 54–4–4(2) (2000); *see also* § 54–4–2 (granting PSC authority to investigate prices, charges, fares, tolls and rentals of any public utility); § 54–4–4(1) (outlining PSC's power to determine just, reasonable or sufficient rates for public utilities); § 54–7–12 (mandating procedure for PSC to increase or decrease rates); § 54–8b–11 (instructing PSC to ensure provision of telecommunications services at just and reasonable rates).

¶ 12 We have consistently adhered to the legislature's intent in delegating adjudication of the rate making function to the PSC. *See Mountain States Tel. & Tel. v. Pub. Serv. Comm'n,* 107 Utah 502, 512–14, 155 P.2d 184, 189 (1945) (Wolfe, J., concurring) (stating that given court's limited authority to review rate orders of PSC, scope of review is confined to determination of proper exercise of PSC's powers); *U.S. Smelting & Ref. & Milling Co. v. Utah Power & Light Co.,* 58 Utah 168, 186, 197 P. 902, 909 (1921) (recognizing that the PSC may regulate utility rates); *Utah Copper,* 59 Utah at 209, 203 P.

at 635 (declining to express opinion on whether utility rates appropriate because such issues should be determined by PSC alone); *Salt Lake City v. Utah Light & Traction Co.,* 52 Utah 210, 227, 173 P. 556, 563 (Utah 1918) ("The Legislature has ... not seen fit to clothe this court with greater powers of review, and we have neither the inclination nor the right to exercise a power which is neither inherent nor properly conferred.").

¶ 13 The Counties emphasize that equitable rights, rather than the rate making function and duties of the PSC, govern this case, and therefore the district court failed to properly exercise jurisdiction. They contend that the only issue this court should consider is whether the specific sum awarded Qwest by the Tax Commission should be returned to the taxpayers under a constructive trust or unjust enrichment principle. They insist that although rate making and related issues are exclusive functions of the PSC, this case differs in that it is not a rate making issue, but an issue of whether ratepayers should receive a refund of a specific award. We find the Counties' contention in this court inconsistent with the underlying premise of the Counties' original position.

¶ 14 In both the district court and the PSC proceedings, the Counties made specific reference to rate making and rate adjustments as being an integral part of the relief they sought. According to the complaint, the Counties sought a determination of whether Qwest had, through its rates, been fully reimbursed for its property taxes in each of the years 1988 through 1996. The complaint also alleged that "in determining the amount to be charged by [Qwest] to those persons and entities using said companies' telecommunication services, ... a component in the rate structure [reflected a recovery] of ad valorem property taxes." In the first cause of action, the Counties further alleged that "[Qwest's] approved rates included a component for recovery of payment of property taxes." Further, in their memorandum in support of their ex parte motion to deposit the $16.9 million tax refund with the district court, the Counties stated:

5. Plaintiffs have initiated a declaratory proceeding before the Public Service Commission of Utah seeking a declaration that, because the taxes already paid have been *recovered through the rate structure previously set by the Public Service Commission of Utah,* that the refunds of those tax payments belong, in whole or in part, to the customers of the defendant *who paid the higher charges in the form of rates set by the Public Service Commission of Utah* premised upon the payment by defendant of those taxes.

6. All or part of the refund monies belong to plaintiffs and other class members, as customers of defendant, *to be determined by declaration of the Public Service Commission of Utah* and, if any such monies do not belong to plaintiffs and other class members, then those monies would belong to defendant.

(Emphasis added.) Finally, in their request for a declaratory ruling, the Counties sought either a refund of rates previously paid through a return of Qwest's tax refund, or "a decrease in price of service sufficient to return the 16.9 million to its Utah ratepayers." Each of these statements discounts the Counties' assertions that the relief they seek does not involve utility rate making and does not require reference to Qwest's overall rate structure.

¶ 15 Essentially, the Counties allege that equity requires the return of the ratepayers funds to the ratepayers because the ratepayers initially overpaid telephone rates that were based on estimates of costs provided by Qwest to substantiate its rates to the PSC. Overpayment alleged by the Counties is necessarily premised on an unjustifiable, changed, or otherwise incorrect initial rate. Simple labeling of the issue in an envelope of equity because a bond of the amount in controversy was posted does not mandate our opening of a discussion of the same where the Counties have clearly acknowledged that the relief they seek involves rate making and rate adjustment. Such relief can be administered only through the PSC as discussed above. *See Klopp v. Commonwealth Edison Co.,* 54 Ill.App.3d 671, 12 Ill.Dec. 911, 370 N.E.2d 822, 824 (1977) (holding that plaintiff's claim that utility's delayed payment charges were excessive was within the exclusive jurisdiction of the Illinois Commerce Commission).

¶ 16 To further buttress their equity claim, the Counties insist that because the court placed corpus of the reward in trust, it is easily definable and only the ownership of the trust is at issue. They contend that because the ownership of the trust is a standard question in equity, the PSC need not hear the case. We disagree. The case Counties cite in support of their argument that the PSC's expertise is not required to resolve its claim does not support the Counties' position. *See Campbell v. Mountain States Tel. & Tel. Co.,* 120 Ariz. 426, 586 P.2d 987 (App.1978). This case applying Arizona law did not hold, as the Counties suggest, that the Arizona Commission had primary jurisdiction only when the cases involved the provision of adequate service to the public. *Id.* Rather, we interpret the case as holding that because the plaintiffs had asserted several claims in tort and one in contract, and because the substance of those claims dominated over any areas involving the commission's expertise, the district court could exercise jurisdiction. *Id.* at 993. In contrast to the *Campbell* decision, this case involves an assessment of the rate making structure, which falls squarely within parameters of "the duties and expertise," and therefore primary jurisdiction, of the PSC. *Id.*

¶ 17 The Counties also cite *Atkin Wright & Miles v. Mountain States Telephone & Telegraph Co.,* 709 P.2d 330 (Utah 1985), for the proposition that the district court has jurisdiction over this case because "the class action suit deals solely with the refund through the Tax Commission, not the rates set by the PSC." The passage from *Atkin* the Counties quote, however, lends support to Qwest's position instead of their own:

Public utilities have no wholesale immunity from the duties imposed by tort law generally. A utility's actions which give rise to tortious or contractual liability and which do not call in question the validity of orders of the PSC *or trench upon its delegated powers* are subject to the jurisdiction of the district court.

*Id.* at 334 (emphasis added.) The case at bar does not involve a claim of tort or breach of

contract. We hold that the decision regarding whether a tax refund to Qwest from the Tax Commission was considered in assessing rates charged to ratepayers is an issue inextricably intertwined with an investigation into the makeup of rates charged by Qwest. Such an investigation would clearly "trench upon [the PSC's] delegated powers." *Id.* We conclude that under these circumstances, jurisdiction properly lies with the PSC and, therefore, the district court properly dismissed the case for lack of subject matter jurisdiction.

## II. DISMISSAL WITH PREJUDICE

¶ 18 The Counties argue that the district court's dismissal of their claim with prejudice was improper because a dismissal for lack of subject matter jurisdiction does not go to the merits of the case and because a dismissal with prejudice would preclude the Counties from pursuing their action before the PSC under principles of res judicata. In essence, the Counties assert that the dismissal with prejudice must be modified so as to eliminate its potential preclusive effect on the ability of the Counties to pursue their claims before the PSC. We agree.

¶ 19 Rule 41(b) of the Utah Rules of Civil Procedure regarding involuntary dismissal provides:

> Unless the court in its order for dismissal otherwise specifies, a dismissal under this

subdivision and any dismissal not provided for in this rule, *other than a dismissal for lack of jurisdiction* ..., operates as an adjudication upon the merits.

(Emphasis added.) Plainly, under the rule, a dismissal for lack of jurisdiction does not result in an adjudication upon the merits.

¶ 20 An adjudication upon the merits is a required element for claim preclusion.[1] "In order for claim preclusion to bar a subsequent cause of action, ... 'the first suit must have resulted in a final judgment on the merits.' "[2] *Macris,* 2000 UT 93, ¶ 20, 16 P.3d 1214 (citations omitted). Because a dismissal of a case for lack of jurisdiction is not on the merits under statute as described above, the Counties' contention that they will be precluded from bringing the case before the PSC is well founded.[3]

¶ 21 Accordingly, we hold that even where exclusive jurisdiction lies with a tribunal outside the jurisdiction of the district courts of this state, it is error in such cases to dismiss with prejudice.[4] Although the issues the Counties raise clearly fall under the PSC's exclusive jurisdiction, the district court erred in dismissing the case with prejudice.

## III. RELEASE OF BOND

¶ 22 When the district court determined that it lacked subject matter jurisdic-

---

1. Claim preclusion is a branch of the doctrine of res judicata. *See Swainston v. Intermountain Health Care,* 766 P.2d 1059, 1061 (Utah 1988). Claim preclusion involves " 'the same parties or their privies and also *the same cause of action,* and this precludes the relitigation of all issues that could have been litigated as well as those that were, in fact, litigated in the prior action.' " *Schaer v. State,* 657 P.2d 1337, 1340 (Utah 1983) (quoting *Searle Bros. v. Searle,* 588 P.2d 689, 690 (Utah 1978)).

2. We need discuss only one of the three elements of claim preclusion here. The other two elements include, first, that "both cases must involve the same parties or their privies," and second, that " 'the claim that is alleged to be barred must have been presented in the first suit or must be one that could and should have been raised in the first action.' " *Macris & Assocs. Inc. v. Neways, Inc.,* 2000 UT 93, ¶ 20, 16 P.3d 1214, 1219 (citations omitted). All three elements must be present for claim preclusion to apply. *See Madsen v. Borthick,* 769 P.2d 245, 247 (Utah 1988).

3. However, the PSC itself has filed an amicus brief in this case stating that it could decide the matter if the Counties file a claim before it as opposed to a request for a declaratory order, which requires the consent of the opposing party. Because Qwest did not consent to the declaratory order hearing, the PSC could not render a decision on the matter.

4. *But see Frigard v. United States,* 862 F.2d 201, 204 (9th Cir.1988) (holding that dismissal with prejudice is appropriate where action cannot be brought in any court due to lack of subject matter jurisdiction); *Midwest Knitting Mills, Inc. v. United States,* 741 F.Supp. 1345, 1352 (E.D.Wis. 1990) (affirming dismissal with prejudice for lack of subject matter jurisdiction on sovereign immunity grounds). There may be an instance in which no court or other tribunal could exercise jurisdiction where a dismissal with prejudice might be proper.

tion, it released the $16.9 million dollar bond to Qwest. The order requiring Qwest to file a bond with the court provided that "the proceeds of [the] surety bond are to be paid to the party or parties as the Court determines upon resolution of this litigation." The Counties argue that the court erred in releasing the bond because there had not been a "resolution of this litigation."

¶ 23 We need not interpret the order of the court because once the court determined that it lacked subject matter jurisdiction, it properly determined it lacked jurisdiction to maintain the surety bond. Further, we see no evidence in the record to indicate that maintaining the bond was necessary to protect the Counties' interests, and therefore, the district court's release of the bond was not error.

## IV. AWARD OF COSTS

¶ 24 Qwest sought and obtained an award of costs incurred for preparation of poster-board exhibits depicting statutes and portions of pleadings. That Qwest chose to have these documents reproduced on poster board does not make them a "necessary disbursement" under rule 54(d) of the Utah Rules of Civil Procedure.

¶ 25 Under our previous interpretation of this provision, we reverse the award of costs for trial exhibits. "Trial exhibits are expenses of litigation and not taxable as costs," *Coleman v. Stevens*, 2000 UT 98, ¶ 14, 17 P.3d 1122 (citing *Young v. State*, 2000 UT 91, ¶ 22, 16 P.3d 549; *Frampton v. Wilson*, 605 P.2d 771, 774 (Utah 1980)). As in *Coleman*, "[w]e therefore conclude that the district court exceeded the permitted range of discretion in awarding these expenses. . . ." 2000 UT at ¶ 14, 1 P.3d 528. Accordingly, we reverse the award of costs.

## V. APPEAL OF DEEMED DENIAL OF DECLARATORY ACTION REQUEST

¶ 26 The apparent basis for the Counties' petition for review of the "deemed denial" of the declaratory action before the PSC is the notion that the failure of the PSC to act within sixty days of the Counties' filing of their request for a declaratory ruling triggers section 63–46b–21(7) of the Utah Code,

Utah Administrative Procedures Act (UAPA). This section provides that "if an agency has not issued a declaratory order within 60 days after receipt of the petition for a declaratory order, the petition is denied." Utah Code Ann. § 63–46b–21(7) (1997).

¶ 27 The provisions of the UAPA dealing with requests for administrative agency declaratory orders unambiguously provide that the agency may proceed to issue a declaratory order that would substantially prejudice the rights of a person who is a necessary party only upon the written consent of that person. Utah Code Ann. § 63–46b–21(3)(b). Certainly, Qwest qualifies as a necessary party to agency action under this provision where Qwest would be required to disgorge nearly $17 million. Qwest has not given its necessary written consent for the PSC to resolve the issues raised by the Counties in the declaratory proceeding.

¶ 28 The PSC is, in effect, boxed in because the Counties have pled for a limited form of relief that can be granted only upon Qwest's consent. The Counties apparently seek review of the "deemed denial" to this court to avoid an argument that section 63–46b–21(7) turns the inability of the PSC to issue a declaratory order into final agency action, thereby initiating the running of the review process. *See* Utah Rules of Appellate Procedure Rule 14(a) (stating time frame in which to petition for review of administrative order absent applicable contrary statute is thirty days).

¶ 29 The Counties did not seek review or rehearing of the PSC's "deemed denial" of the declaratory action. We are without jurisdiction to review administrative orders unless and until the Counties apply for review or rehearing pursuant to section 54–7–15 of the Utah Code. *See Hi–Country Homeowners Ass'n v. Pub. Serv. Comm'n*, 779 P.2d 682 (Utah 1989) (holding that association was required to seek PSC review or rehearing of its ruling to invoke jurisdiction of this court).

¶ 30 We have held that "[w]here the outlined procedures have not been complied with, this court is without jurisdiction over the subject matter of the dispute." *Utah Dep't of Bus. Reg. v. Pub. Serv. Comm'n*, 602 P.2d 696, 699 (Utah 1979); *see also Williams*

*v. Pub. Serv. Comm'n,* 754 P.2d 41, 48–49 (Utah 1988) ("[T]he parties' failure to request rehearing before the PSC leaves the Court without subject matter jurisdiction over the petition."). Under these standards, we lack jurisdiction to entertain the review because the Counties did not petition for rehearing pursuant to section 54–7–15 and thus we must dismiss the petition for review of the declaratory action.

## CONCLUSION

¶ 31 We affirm the district court's dismissal for lack of subject matter jurisdiction and hold that dismissal with prejudice was error. We also affirm the district court's release of the surety bond to Qwest, but reverse the award of costs to Qwest. We dismiss the Counties' petition for review of the declaratory action as the Counties did not seek a rehearing before the PSC.

¶ 32 Associate Chief Justice RUSSON, Justice DURHAM, Justice WILKINS, and Judge THORNE concur in Chief Justice HOWE's opinion.

¶ 33 Having disqualified himself, Justice DURRANT does not participate herein; Utah Court of Appeals Judge WILLIAM A. THORNE sat.